STEVEN PEREZ, Plaintiff-Appellee, v. JOSEPH HARTMANN, Defendant-Appellant.

First District (3rd Division)   No. 1—88—3222

Opinion filed August 30, 1989.

Brinton, Bollinger & Ruberry, of Chicago (Mark Wolfe and Kimberly A. Baker, of counsel), for appellant.

Mullen, Minella & Chase, of Chicago (John C. Mullen and Cynthia L. Chase, of counsel), for appellee.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Steven Perez, sued defendant, Dr. Joseph Hartmann, for medical malpractice in connection with defendant's treatment of plaintiff at Good Samaritan Hospital (Good Samaritan) in 1982. A jury trial resulted in a verdict for plaintiff in the amount of $40,000. Defendant appeals from the judgment for plaintiff.

Plaintiff was taken to Good Samaritan on August 7, 1982, with complaints of shortness of breath, headache, nausea, dizziness and chest pain. After being examined in the emergency room, plaintiff was admitted to the telemetry unit for monitoring of his heartbeat for any abnormalities. Shortly thereafter, a nurse at the nursing station outside plaintiff's room noticed that the monitor connected to plaintiff exhibited a flat line, indicating a condition known as asystole or, more commonly, cardiac arrest. The nurse went into plaintiff's room, examined him for a pulse, found none and, with another nurse, began cardiopulmonary resuscitation (CPR). At this time a Code Blue condition

was instituted. Defendant, who was then making his rounds, reported to plaintiff's room in response to the Code Blue. Defendant found plaintiff being attended to by several nurses. Upon examining plaintiff, defendant detected no pulse or breathing and believed that plaintiff had experienced an episode of sudden death. As defendant assisted in administering cardiac massage to plaintiff, he was informed by one of the nurses that she had seen a long period of asystole prior to the Code Blue which prompted her to administer CPR.

However, due to the trial court's grant of plaintiff's motion *in limine*, defendant was precluded from testifying that the nurse also handed him a strip of paper produced by the nursing station monitor (EKG strip) indicating the asystolic episode. Plaintiff's motion was grounded upon defendant's alleged failure to produce the EKG strip despite the fact that plaintiff had sought it for over four years. The trial court's order prohibited any reference to the strip but allowed the nurses to testify as to what they had seen on the monitor.

The efforts of the nurses and defendant revived plaintiff. Thereafter, he was hooked up to a second portable monitor in his room. Shortly thereafter, defendant claimed, but plaintiff denied, plaintiff experienced a second period of total asystole producing a flat line on the portable monitor. Thereupon, defendant administered a precordial thump, *i.e.*, one fist to the chest, and cardiac massage. Plaintiff once again regained consciousness. Plaintiff was then transferred to the intensive care unit, where defendant took a history and performed a physical examination. Although plaintiff related a history of chest pain, dizziness, light-headedness and shortness of breath, defendant was unable to detect any patent abnormality. Defendant determined that the two episodes of asystole which he claimed plaintiff had experienced warranted the implantation of a temporary pacemaker.

After its implantation, defendant was able to rule out heart attack as the cause of plaintiff's asystolic episodes. After a period of time during which the temporary pacemaker functioned properly and additional tests were conducted upon plaintiff, defendant discussed the possibility of a permanent pacemaker with plaintiff. Ultimately, a permanent pacemaker was implanted by a cardiovascular surgeon at Good Samaritan. Defendant testified that plaintiff had no complaints after the operation except for local discomfort at the location of implantation. However, plaintiff testified that, after the operation, he started getting headaches and chest pains and did not feel well.

After his discharge on September 13, 1979, plaintiff returned to the hospital with complaints of headaches, chest pain, dizziness and faintness. Plaintiff also complained that he could feel his pacemaker

fire. After testing, defendant found no correlation between plaintiff's complaints that he could feel the pacemaker fire and its actual firing. Nor did defendant find any abnormalities in the pacemaker. After a neurological examination, plaintiff was diagnosed as suffering from migraine headaches and mild anxiety neurosis. Plaintiff left the hospital against the advice of hospital personnel. He returned on September 23 and had his blood pressure checked and an electrocardiagram, or EKG, taken. On September 29, plaintiff sought treatment at the University of Illinois Hospital (U. of I.) for chest pains and headaches. During plaintiff's treatment at U. of I., his pacemaker was removed.

## Opinion

■ Defendant first contends the trial court abused its discretion in sanctioning his failure to produce the EKG strip made on August 7, 1979, by barring any reference to it at trial, although the defense produced it one month before trial.

Defendant asserts that, like the plaintiff's counsel in *Department of Transportation v. Mainline Center, Inc.* (1976), 38 Ill. App. 3d 538, 347 N.E.2d 837, his counsel also took over the case from another attorney and did not know that his client had not complied with a discovery order. Defendant also notes that, similar to the defendant's counsel's failure in that case to inform plaintiff's new counsel during several pretrial meetings of any failure to comply with discovery, plaintiff's counsel here failed to notify defendant's new counsel of any extant discovery disputes although the latter asked to be advised of any discovery matters upon coming into the case.

Contrary to defendant's arguments, we find *Mainline Center*, a condemnation case, distinguishable. Therein, the exclusion of all of the plaintiff's appraisal witnesses for failure to comply with a discovery order "substantially precluded plaintiff from introducing *any* pertinent evidence on the *main* issue under consideration, leaving the jury with *only* defendant's version as to the extent of damages." (Emphasis added.) (*Mainline Center*, 38 Ill. App. 3d at 540.) Here, in contrast, defendant was not precluded from introducing *any* evidence on one of the *main* issues here, *i.e.*, whether plaintiff had experienced a second asystolic episode. As such, the jury in this case, unlike that in *Mainline Center*, did not have before it *only* the plaintiff's claim that he had not suffered a second episode of asystole.

Moreover, in *Mainline Center*, because the file received by the plaintiff's new counsel contained neither a copy of the discovery order nor any reference to it, he first learned of the order when the defendant presented its motion to exclude witnesses. In contrast, it is undis-

puted that the file in this case contained a letter, dated December 17, 1982, from plaintiff's former counsel to defendant's former counsel requesting a copy of the "missing medical records referenced," *viz.*, the EKG strip, at the deposition of plaintiff's expert, Dr. Gerard Parent. The file also contained a trial court order, dated July 30, 1984, that defendant "produce the original medical record showing a 6 second period of asystole of the plaintiff." Finally, the file contained motions by plaintiff to bar evidence and for a rule to show cause, noticed for November 20, 1985. The motion to bar evidence alleged defendant's noncompliance with the July 30, 1984, order and specifically referred to "medical records and telemetry monitoring strips." Similarly, the motion for rule alleged Good Samaritan's noncompliance with a subpoena issued December 11, 1984.

Thus, unlike the file in *Mainline Center*, the file in this case sufficiently put defendant's new counsel on notice that there was a possibility, if not a probability, of an extant problem with discovery, notwithstanding plaintiff's counsel's failure to inform him of that fact. If defendant's counsel did not know of the problem until after he produced the EKG strip to plaintiff a month before trial, he should have.

Defendant notes that sanctions are appropriate when an uncooperative party demonstrates a deliberate, contumacious or unwarranted disregard of a court's authority (*Mainline Center*, 38 Ill. App. 3d 538, 347 N.E.2d 837) and asserts that that is not the case here. We disagree.

Specifically, defendant's testimony in his offer of proof supports a conclusion that the failure to produce the strip was deliberate, contumacious and unwarranted. In his offer of proof, defendant denied that his former counsel had or had seen the EKG strip prior to Dr. Parent's deposition, conducted in 1982. This was contrary to the impression made by defense counsel when he revealed the existence of the strip at the deposition. However, defendant did state that, sometime thereafter, he asked the director of medical records at Good Samaritan to copy the EKG strip and send it to him and that he forwarded the strip, apparently, to his former counsel.

Defendant's testimony thus belies his assertion that his former counsel could not and did not obtain the EKG strip although he attempted to satisfy plaintiff's request for it. As defendant admitted that his former counsel had the strip, and as this had to be by 1986, at the latest, when his new counsel took the case over, he could not avoid the consequences, either intentionally or otherwise, of a failure to forward a copy of the strip to plaintiff by obtaining new counsel.

*Uhwat v. Country Mutual Insurance Co.* (1984), 125 Ill. App. 3d

295, 465 N.E.2d 964, also fails to compel a finding of an abuse of discretion here. In *Uhwat*, the defendant asserted that the trial court erred in admitting copies of tax returns which it had requested from the plaintiff. It first argued that plaintiff had not produced certain accounting records which defendant required for cross-examination relating to the tax returns. In disagreeing, the appellate court noted, significantly, that the case cited by the defendant in support "does not require trial courts to find violations and impose sanctions but merely reaffirms the trial court's discretion to do so." (*Uhwat*, 125 Ill. App. 3d at 304.) The court then held it within the trial court's discretion to believe testimony that the accounting records had been searched for but not found. Similarly here, it was within the trial court's discretion to accept the reasons given by plaintiff for barring the EKG strip rather than defendant's representations regarding the efforts to comply with plaintiff's counsel's request for plaintiff's medical records. The trial court was not *required* to accept the latter over the former.

The *Uhwat* defendant also argued that the returns should not have been admitted because they were not produced, as requested, at the opening of trial. In disagreeing, the appellate court noted that the returns were produced on the first day of trial and that the defendant had an opportunity to examine them before cross-examining plaintiff's accountant, since he did not testify until the next day.

This aspect of *Uhwat* likewise does not require a finding of abuse of discretion in this case. In contrast to *Uhwat*, plaintiff here had sought his medical records, including the EKG strip, well before the advent of trial. A 1982 request by his then counsel for the records was unsuccessful. So was a 1984 trial court order requiring defendant to produce the records. So too, apparently, were the motions to bar evidence and for rule to show cause. As plaintiff sought the EKG strip well before the start of the trial in this cause, as opposed to requesting its production at "the opening of trial," the trial court did not abuse its discretion in finding that defendant's production of the EKG strip one month before trial justified excluding it at trial.

■ In regard to the prejudice caused plaintiff by defendant's belated production of the strip, we note the representation in plaintiff's counsel's 1982 letter that, in view of the new development, defendant would have to be redeposed. We also note that Dr. Parent did not have access to the strip in preparing his discovery deposition testimony inasmuch as defendant's counsel revealed the existence of the strip at his deposition. In contrast, it is undisputed that defendant's expert had access to the strip in preparing both his deposition and trial testimony. Finally, we cannot agree with defendant that his pro-

duction of the EKG strip one month before trial gave Dr. Parent sufficient time to analyze and prepare to testify at trial concerning the strip. Plaintiff's counsel informed the trial court that Dr. Parent was unavailable when she received the strip from defense counsel and that she did not know what his "reaction" to the strip would be.

In contrast, any prejudice caused defendant by exclusion of the strip was minor. The strip evidenced the first episode of asystole plaintiff suffered before defendant responded to the Code Blue. Both parties agreed, and their experts testified, that plaintiff suffered at least one such episode. They disagreed, however, whether plaintiff suffered a second episode of asystole in defendant's presence and of which defendant sought to introduce no EKG strip. Because the first episode was undisputed, exclusion of the strip evidencing that episode would not, as defendant asserts, have justified the jury in doubting his testimony regarding that episode, and concomitantly, the second episode as well. Finally, while defendant argues that the strip was the most crucial piece of evidence because it provided the basis for all of his subsequent treatment of plaintiff, his testimony on that fact varied at trial. In addition to testifying to that effect, defendant also testified that his decisions to recommend temporary and permanent pacemakers were based on plaintiff's having two episodes of asystole. If those decisions by defendant were based on both episodes, we cannot see how, as defendant now asserts, the EKG strip of the first episode was the most crucial piece of evidence. As such and because defendant did not and .does not explain what it was about the EKG strip that made it so crucial, any prejudice to him from its exclusion did not require denying plaintiff's motion.

In sum, there was sufficient evidence of surprise to plaintiff's counsel, prejudice to plaintiff, diligence of plaintiff's counsel, timely objection and a lack of good faith on the part of defendant or his former or present counsel to warrant exclusion of the EKG strip. *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 415, 476 N.E.2d 1232.

■ Defendant next contends that it was reversible error for plaintiff's counsel to refer to the EKG strip at trial in violation of the *in limine* order.

At trial, plaintiff's counsel asked Dr. Parent if he knew whether plaintiff was hooked up to the telemetry unit at the nurse's station after the Code Blue was called. Defense counsel objected but withdrew the objection after a sidebar. Thereafter, Dr. Parent answered that he assumed that plaintiff was connected to the nurse's station monitor. Plaintiff's counsel then asked Dr. Parent whether he had seen any-

thing in plaintiff's medical records which documented the monitor strip or the second episode of asystole. Dr. Parent testified that he had not. Defense counsel objected neither to the question nor the answer. Defendant therefore waived any error therein for purposes of appeal. *Hirn v. Edgewater Hospital* (1980), 86 Ill. App. 3d 939, 408 N.E.2d 970; *Bell v. City of Joliet* (1980), 83 Ill. App. 3d 103, 403 N.E.2d 740.

In cross-examining a defense witness, Nurse Elizabeth Nosek, who was at the nurse's station of the telemetry unit on August 7, 1979, before the Code Blue was called, plaintiff's counsel asked her whether the monitor there "was programmed so that a strip would be printed out." Defendant's objection to this question was sustained. In ruling upon defendant's post-trial motion for new trial based on this error, the trial court found that, while counsel's conduct was a partial violation of the *in limine* order, it was not "a knowing violation."

Plaintiff's counsel's improper cross-examination of Nosek was harmless error. Initially, we note that, as plaintiff's counsel argued in support of her question to Nosek, defense counsel had asked Dr. Parent whether the monitor at the nurse's station would not produce a readout unless the button was pushed to make the readout a permanent record and whether, if everyone was at the Code Blue, there would be anyone at the nurse's station to hit the button to document the strip. That plaintiff's counsel violated the order *in limine* in attempting to respond to defendant's similarly improper questioning of Dr. Parent is a factor in finding it harmless. (See *In re Estate of Loesch* (1985), 134 Ill. App. 3d 766, 771, 481 N.E.2d 32.) Moreover, after sustaining defendant's objection to counsel's question, the trial court instructed the jury to disregard any references to any monitor strip. That instruction normally suffices to prevent or cure any prejudice to the objecting party. (See *Tomaszewski v. Godbole* (1988), 174 Ill. App. 3d 629, 529 N.E.2d 260.) Finally, there was not a great likelihood of prejudice from this violation of the order *in limine. Tomaszewski*, 174 Ill. App. 3d 629, 529 N.E.2d 260.

■ Defendant next contends that an instruction that plaintiff claimed that defendant interpreted medical workup tests improperly was reversible error where there was no evidence to support that allegation of negligence in plaintiff's compliant.

As defendant notes, it is error to give an instruction not based on evidence produced at trial. (*Vincent v. Wesolowski* (1967), 87 Ill. App. 2d 477, 232 N.E.2d 120.) However, we find that there was sufficient evidence at trial to permit instructing the jury on this aspect of plaintiff's cause of action. We construe this aspect of plaintiff's cause of

action as alleging that defendant was negligent in recommending a permanent pacemaker, since the tests conducted upon plaintiff did not support that recommendation.

Dr. Parent testified as follows on direct examination. After August 7, 1979, plaintiff underwent a cardiac catheterization which showed that he had "normal heart muscle and normal coronary arteries." He also underwent an ergonovine study to detect coronary spasm, *i.e.*, a temporary closing of the arteries, which turned out normal. In his opinion, to a reasonable degree of medical certainty, in light of plaintiff's normal test results, the temporary pacemaker should have been set at a very slow rate of operation and a determination made whether plaintiff's heart rhythm paused, necessitating a permanent pacemaker. Asked whether anything in the record suggested that plaintiff would have a slow heart rate or irregular heart rhythm in the future, he responded that, while he saw no significant abnormalities, they were not allowed to present themselves because the temporary pacemaker was not set at a slow enough rate of operation. There was no evidence in the record that plaintiff had an A-V block or problem in the conduction of his coronary arteries. To a reasonable degree of medical certainty, Dr. Parent did not agree with defendant's diagnosis that plaintiff had sick sinus syndrome because he did not see, *i.e.*, find, data for that diagnosis.

On cross-examination, Dr. Parent testified as follows. He disagreed that defendant could not have predicted whether plaintiff would suffer episodes of asystole in the future no matter how many tests he could have done. He also did not believe that it was reasonable for defendant to have recommended a permanent pacemaker assuming the occurrence of two asystolic episodes and the performance of the tests which defendant had performed on plaintiff.

The evidence deposition of Dr. Richard Balsamo, who treated plaintiff at U. of I. in September 1979, where he had the permanent pacemaker removed, was read to the jury after Dr. Parent's testimony. At his deposition, Dr. Balsamo testified as follows. His discharge summary of plaintiff's treatment reflected that, after an electrophysiological study was performed at the U. of I., it was determined that plaintiff's "SA node function was normal." The SA node is the part of the heart "normally responsible" for the heart's pacemaker function, *i.e.*, the part from which the heart's normal electrical impulse is generated. A U. of I. progress note dated October 9, 1979, relating to plaintiff's treatment reflected that plaintiff's chart from Good Samaritan had been reviewed by U. of I. personnel. The note further stated, " 'Diagnosis of acute pericarditis, nor sick sinus

syndrome not well supported by limited workup.' " Lastly, the note stated, " 'The consensus is we find no compelling reason to have [or leave] permanent pacemaker in.' "

On direct examination, defendant testified as follows. He was able to rule out a heart attack as the cause of plaintiff's condition by measuring his enzymes and finding that his heart muscle was not damaged. Defendant also ordered a chest X ray and "blood work" to make sure that plaintiff had no electrolyte abnormalities. These tests were negative. Defendant also performed a cardiac catheterization to determine whether plaintiff had blocked coronary arteries or congenital defects in the heart. These tests yielded normal results. An ergonovine test to detect coronary spasms which cause chest pain and arrhythmia was normal. Defendant recommended a permanent pacemaker because of the two episodes of asystole and because none of the three natural pacemakers in the human heart, the sinus node, the A-V node or the cells in the ventricle, worked in plaintiff's heart. On cross-examination, defendant testified that he based his recommendation and his diagnosis of sick sinus syndrome on the two episodes of asystole. On redirect examination, defendant admitted that the results of the tests performed on plaintiff were "significant negatives" in his decision to recommend a permanent pacemaker.

In direct examination, defendant's expert, Dr. Rolf Gunnar, was asked whether defendant reached a diagnosis of plaintiff's problem after the tests performed on plaintiff. He testified that defendant's diagnosis fell under the umbrella of sick sinus syndrome, in which the sinus node, the heart's basic pacemaker, did not function properly. In addition, plaintiff's subsidiary pacemakers did not work either. On cross-examination, Dr. Gunnar described sick sinus syndrome as "partly a diagnosis of exclusion," i.e., "[y]ou exclude other things, and you then end up with that as a definition."

Notwithstanding the absence of specific testimony that defendant failed to properly interpret medical workup tests, the foregoing testimony was sufficient to support the instruction of which defendant complains. Specifically, the testimony of plaintiff's expert and treating physicians supported a conclusion that, had defendant properly interpreted the results of the tests performed on plaintiff which showed that plaintiff's heart functions were normal, he would not have reached a diagnosis of sick sinus syndrome and recommended implantation of a permanent pacemaker. In this regard, we note that, while defendant and his expert testified that all three of plaintiff's natural pacemaker systems were defective, they seemed to base that conclusion equally on the negative results of the tests performed on plaintiff

*and* the two episodes of asystole which defendant claimed plaintiff suffered. As such, the extent to which the latter supported defendant's diagnosis and recommendation depended upon whether the jury accepted his claim that plaintiff suffered two episodes of asystole. If the jury made a factual finding that only one episode occurred, as it could have given the conflicting evidence, it could then have found that defendant's diagnosis and recommendation were negligent, in view of the negative test results. There was no error in the instruction given.

Defendant next contends it was reversible error to allow certain exhibits to go to the jury over his objections.

■ A trial court has broad discretion to decide whether exhibits may be taken into the jury room. Its decision will not be reversed absent an abuse of that discretion. *Smith v. Victory Memorial Hospital* (1988), 167 Ill. App. 3d 618, 521 N.E.2d 210.

■ Defendant now asserts that he was prejudiced by the fact that these exhibits contained references to the barred EKG strip. However, he did not make that argument to the trial court. Therefore, we find that he has waived any error on this ground in the admission of the complained-of exhibits. Defendant also argues, as he did below, that, by allowing these exhibits to go to the jury, the trial court allowed it to give undue consideration to them rather than evaluating all the evidence at trial. However, given defendant's failures to include the exhibits in the record on appeal, or to describe their contents sufficiently to allow the court to properly evaluate them or to cite any authority in support of his assertion, his argument is mere contention, which we need not address. See *Fultz v. Peart* (1986), 144 Ill. App. 3d 364, 380, 494 N.E.2d 212 (and cases cited therein).

■ Defendant next contends that it was reversible error to allow Dr. Balsamo to testify to notations in the U. of I. records which he did not make. We agree that allowing such testimony by a nonexpert witness is normally error. (*Khatib v. McDonald* (1980), 87 Ill. App. 3d 1087, 410 N.E.2d 266.) However, defendant waived the error by failing to object either during Dr. Balsamo's evidence deposition or when it was read into evidence at trial. To question the admissibility of testimony a party must object in apt time to obtain a ruling by the trial court to avoid a waiver of the objection. (*Wanland v. Beavers* (1985), 130 Ill. App. 3d 731, 474 N.E.2d 1327.) In this regard, the record does not bear out defendant's assertion that he objected to Dr. Balsamo's testimony at trial outside the presence of the jury.

In support of that assertion, defendant cites to page 1 of the supplemental record on appeal, which contains a transcript of that por-

tion of the trial at which Dr. Balsamo's deposition was read into evidence. The relevant portion of that page states, "Proceedings were had and reported but are not transcribed here." Examination of the main record on appeal reveals that prior to the reading of Dr. Balsamo's deposition before the jury, the court and counsel discussed whether the exhibits which plaintiff used at the deposition would be allowed into evidence. They also discussed the deletion of certain unimportant portions of the transcript. The record does not contain any objection to Dr. Balsamo's testimony on the ground asserted on appeal. As such, defendant did waive it.

■ Defendant lastly contends that it was reversible error to bar the nurses who assisted in plaintiff's care on August 7, 1979, from testifying to their opinion whether plaintiff died during the Code Blue.

While the nurses were not permitted to so testify, defendant did testify that plaintiff had experienced an episode of sudden death on August 7, 1979. His expert, Dr. Gunnar, also testified that plaintiff had died at that time. Given the differences in medical training, education, knowledge and expertise revealed at trial between defendant and Dr. Gunnar on the one hand and the registered nurses called on his behalf on the other, we do not believe the trial court erred in barring the latter from giving their opinions whether plaintiff had died while at Good Samaritan, especially in view of defendant's failure to cite any contrary authority.

Moreover, any error in that ruling was not so prejudicial to defendant as to require a new trial. Error in the exclusion or admission of evidence is not reversible error where there has been no prejudice, where the trial result was not materially affected (*Young v. City of Centreville* (1988), 169 Ill. App. 3d 166, 523 N.E.2d 621) or where the testimony is cumulative (*Malawy v. Richards Manufacturing Co.* (1986), 150 Ill. App. 3d 549, 501 N.E.2d 376). The jury apparently decided that the admitted testimony that plaintiff had died did not warrant a verdict for defendant. As the nurses' testimony would have been cumulative thereto, defendant was not prejudiced by its exclusion.

For all of the foregoing reasons, the judgment for plaintiff and the denial of defendant's post-trial motion are affirmed.

Affirmed.

RIZZI and WHITE, JJ., concur.