THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JULIA CAMDEN, Defendant-Appellant.

Fifth District   No. 5—89—0284

Opinion filed August 30, 1991.—Rehearing denied September 27, 1991.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Jon C. Anderson, State's Attorney, of Robinson (Kenneth R. Boyle, Stephen E. Norris, and Scott A. Manuel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

Following a jury trial in the circuit court of Crawford County, defendant, Julia Camden, was found not guilty of attempted murder and guilty but mentally ill of armed violence (Ill. Rev. Stat. 1983, ch. 38, par. 33A—2) and two counts of aggravated battery (Ill. Rev. Stat. 1983, ch. 38, pars. 12—4(a), (b)(1)). Defendant was sentenced to a six-year term of imprisonment and subsequently perfected the instant appeal.

The following issues are presented for review: (1) whether the State failed to prove defendant's sanity beyond a reasonable doubt; (2) whether the trial court erred in refusing to grant a mistrial based

upon the testimony of a witness which exceeded the scope of a pre-trial order; (3) whether the trial court erred in giving the second paragraph of the instruction defining insanity; (4) whether the prosecutor's closing argument was improper and so prejudiced defendant as to deny her a fair trial; and (5) whether defendant's aggravated battery convictions must be vacated where they were used as the predicate offense for the charge of armed violence.

The record of defendant's February 1989 trial contains the following evidence. Defendant and Ivan "Yancey" York, Jr. (York), began dating in April 1980, and in November 1981, they moved in together. In January 1983, defendant and York separated, but dated occasionally until early July 1983.

Around 4 p.m. on July 21, 1983, defendant accompanied her friend Connie Siebeck to the Saloon Tavern in Robinson, Illinois. York and Dennis York also arrived at the tavern around 4 p.m. The parties did not converse. After about 10 minutes, the two men returned to Dennis York's house. Ms. Siebeck left the tavern at approximately 6 p.m., but defendant remained there. Around 8:30 p.m., York returned to the tavern and defendant was still there. York sat at a table with Kevin Pethel, Barbara Pethel, Mona Pethel, and Elder York for approximately 20 minutes and then left with Kevin Pethel to go to the Oasis Bar.

After York and Kevin Pethel left, defendant came to the table and asked Barbara Pethel, "Did he leave with that broad?" Barbara Pethel told defendant she did not know to whom defendant was referring. When York returned to the tavern approximately one hour later, defendant was still seated at the bar. York rejoined the Pethels and Elder York. York and Elder York were talking when defendant approached the table. York heard defendant say "I hope you enjoyed yourself," heard a gunshot, and saw that he was wounded in the left side of the abdomen. Barbara Pethel and Mona Pethel testified that defendant said to York, "Did you enjoy it?" After the shooting, defendant turned, tripped over Mona Pethel's chair, knocking her to the floor, and hurried out of the tavern. Defendant then walked to the Crawford County jail.

Although defendant did not deny during the trial that she shot York, she asserted that she was insane at the time of the offense. The jury, which was instructed that the State bore the burden of proving beyond a reasonable doubt that defendant was sane, found defendant guilty but mentally ill of armed violence and battery.

Defendant initially argues on appeal that the State failed to prove her sanity beyond a reasonable doubt. At the time of the offense, the

affirmative defense of insanity was codified by section 6—2 of the Criminal Code of 1961, which provided:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) A person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, [sic] is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill.

(d) For purposes of this Section, 'mental illness' or 'mentally ill' means a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he was unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law." Ill. Rev. Stat. 1981, ch. 38, pars. 6—2(a) through (d).

Whether the State carried its burden of proving defendant sane is a question of fact, and the jury's determination will not be reversed unless so improbable or unsatisfactory as to create a reasonable doubt as to the defendant's sanity or so palpably erroneous as to suggest its basis as passion or prejudice. (*People v. Silagy* (1984), 101 Ill. 2d 147, 169, 461 N.E.2d 415, 425-26, *cert. denied* (1984), 469 U.S. 873, 83 L. Ed. 2d 156, 105 S. Ct. 227.) In deciding whether a defendant's guilt of a crime was established beyond a reasonable doubt, the ultimate question is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.

The following evidence was introduced concerning the insanity defense. Friends and family testified that after defendant and York separated, there was a change in defendant's behavior and appearance. Defendant became tired, depressed, and forgetful, and drank heavily. Defendant stopped eating, getting dressed, and taking care of her home. Defendant was often crying and her weight dropped dramatically. Defendant also discontinued most of her social activities.

Defendant testified that in late May 1983, she stopped functioning "as a person." She felt there was no purpose to her life and would not get out of bed. For her children's sake, defendant tried to remain in control. For several weeks in July, she worked as a receptionist for a local eye doctor to pay off her bill. However, she struggled to do this job because of her preoccupation with York.

York testified that on June 29, 1983, he spent the night with defendant and they discussed her possible pregnancy. York also stated that following the last night they spent together, which defendant testified was July 2, 1983, he laughed at defendant, called her a "fool," and told her he had no intention of coming back to her. York testified that on the morning of July 7, defendant came to see him and told him that she had made arrangements for a pregnancy examination in Terre Haute, Indiana, the next day and wanted York to accompany her. York at first agreed, but reneged after defendant said she would shoot him and his new girlfriend, Joyce Guyer, if she saw them together. Defendant also told York that if she could never have him, no one would. York testified that when he was living with defendant she carried a gun in her purse at all times.

Defendant denied ever making any threats to York, although she admitted speaking to him on July 7 regarding her pregnancy examination. Also on July 7, defendant went to Joyce Guyer's apartment with some of York's mail. Defendant and Ms. Guyer had an altercation which resulted in defendant's arrest for battery. Officer Bill Millsap of the Robinson police department advised defendant to stay away from Guyer and York. Although Ms. Guyer testified that defendant had threatened to shoot her and York if she saw them together, defendant denied making such a threat.

Dr. Leonard J. Green III testified that he examined defendant on July 8, 1983. Defendant wanted to have a prior tubal ligation "undone" to enable her to have another child. The tubal ligation had been performed in August 1974, and defendant had her right ovary removed. Dr. Green's examination revealed no physical abnormalities.

Between July 7 and 20, defendant made numerous calls to York at the Saloon Tavern. York took some of the calls, during which defendant would cry and talk of her heartbreak. York thought defendant sounded sad, "like she had lost a great love." York stated that during the time he lived with defendant, she never visited any psychologist or psychiatrist. York described defendant as a rational and very understanding woman with a normal temper. York admitted, however, that during defendant's first trial in 1984, which ended in a mistrial, he had testified that defendant behaved irrationally on occasion.

Connie Siebeck testified that on July 21, 1983, she and defendant talked about defendant's emotional upset over her break-up with York, and later Ms. Siebeck invited defendant to go to the Saloon Tavern with her. At the tavern, defendant did not laugh or talk much, although there were conversations going on around her. When Ms. Siebeck left around 6 p.m., she tried to get defendant to go with her and was concerned because defendant talked as if York was at the tavern when he had already left. Ms. Siebeck stated that defendant never threatened to harm York during any of their conversations.

Karen Phillippe, the bartender at the tavern on July 21, 1983, testified that defendant was seated at the bar when she arrived at 4 p.m. Defendant remained at the bar until the shooting. Between 4 and 7 p.m., Ms. Phillippe spent most of her time on a bar stool across from defendant. Defendant told Ms. Phillippe she was not drinking heavily because she thought she was pregnant with York's child. Ms. Phillippe stated that defendant was "laughing and talking and seemed like she was really in good spirits."

Donald Gregory, who was celebrating his birthday at the tavern on July 21, testified that he sat next to defendant at the bar and that defendant talked, laughed, and joked with him. Gregory also stated that defendant asked him to help her fix a storm door at her house and they arranged a date for the repair work. Barbara Pethel testified that when defendant first approached her table and asked if York had left with "that broad," defendant's voice was "normal" but she sounded as if she were angry.

Billy J. Carrico, a deputy sheriff in Crawford County on July 21, 1983, testified that about 11 p.m. the dispatcher received a telephone call regarding a shooting at the tavern. Shortly thereafter, defendant came in the back door of the jail, walked into the radio operator's room, and sat down at a desk. Carrico spoke to defendant several times and asked if he could do anything for her but received no response. Defendant sat perfectly still with her hands on the desk, looked directly ahead, and took no notice of Carrico or the radio operator. Carrico removed defendant's purse from her reach and saw a gun inside it. He noticed that she was trembling and shaking, and when he checked her forehead it was moist and cool. Carrico decided that defendant was exhibiting symptoms of shock and catatonia so he requested that the radio dispatcher call for an ambulance.

Carrico further testified that when he and the ambulance attendant laid defendant on a stretcher, she began to physically resist them and to talk about her children and a ball game. Officer Millsap came into the room and defendant recognized him. Millsap read defendant

her *Miranda* rights, placed her under arrest, and questioned her about the incident at the tavern. Defendant told Millsap that she had not seen or bothered "the girl," according to Millsap's advice, and continued to talk about her children and the ball game.

Harietta Hunnicutt, the wife of the Crawford County sheriff, testified that she was present when defendant entered the county jail. Ms. Hunnicutt described defendant as "very unresponsive," stating that defendant made no response when Carrico spoke to her, stared into space, and did not appear aware that anyone else was there. Defendant did speak with Officer Millsap and told him, "I did what you told me to. I stayed away." Ms. Hunnicutt went to the Crawford County Memorial Hospital with defendant and remained with her until she was placed in a hospital room for the night. In the emergency room, defendant seemed "very disoriented" and repeatedly said she needed to pick up her children at the park. Ms. Hunnicutt did not recall defendant saying it was midnight or curfew, asking a nurse to call her sister, calling her sister by name, or saying that she had to check on her boyfriend.

William G. Millsap, a former police officer for the City of Robinson, Illinois, testified that at 11:15 p.m. on July 21, 1983, he went to the Crawford County jail, where he saw defendant. Defendant recognized him and called him by name. Millsap arrested defendant and read her the *Miranda* rights. Defendant mentioned ball games and stated that she was worried about her children being in at curfew. Millsap went to the emergency room, where defendant made statements that she was afraid her former husband, Doug Camden, would take her children away from her. Millsap testified that defendant said, "I hate to do it, but contact Doug and have him take care of the girls." Defendant also stated more than once that it was midnight and time for her and her boys to be home. Millsap admitted having previously told defendant that it was a quarter till 12. Defendant told Millsap that she remembered they had talked and that she had not gone to "Joyce's place" because he had told defendant she should not. Millsap confirmed that he and defendant had such a talk regarding Joyce Guyer on July 7.

Millsap further testified that when he asked defendant who her boyfriend was, she replied that she did not have one. She then said that she wanted to see how he was. In response to Millsap's questions, defendant said she had not been close to a tavern, that she had been to a ball game, and that she could not drink at a ball game. Defendant asked Millsap if he had contacted her sister, Pam Brashear, and gave him her telephone number. When Ms. Brashear arrived, she

and defendant were happy to see each other and hugged. Defendant stated that she did not know why she was in the hospital.

Pam Brashear testified that after learning of the shooting she went to the hospital around 12:30 a.m. Defendant was sitting on the examining table and was saying that she had to go to the ballpark to get her children. Ms. Brashear tried to hold defendant, but defendant did not seem to know her and tried to get off the table. Ms. Brashear blocked defendant's path, and defendant was held and given an injection. Ms. Brashear tried to get defendant to realize where she was, but defendant continued to talk about the ballpark. Ms. Brashear stated that the two had been to the ballpark the previous night. Ms. Brashear admitted that at the trial in 1984, she had testified that defendant did recognize her and had stated, "It looks like a hospital," and had asked why she was there.

Mary Jane Parker testified that she was on duty as a registered nurse when defendant was brought into the emergency room. Defendant entered the hospital leaning on Officer Millsap and crying. Ms. Parker stated that defendant did not seem very rational. Defendant repeatedly said that she thought she had to leave to get her children from a ball game. Ms. Parker did not remember defendant saying that it was midnight or curfew, that she had to check on her boyfriend, or that she had asked someone to call her sister. At the previous trial, Ms. Parker testified that defendant recognized her sister Pam and called her by name, but Ms. Parker did not recall that when testifying in 1989.

Cheryl Wartsbaugh, a floor nurse on duty when defendant was admitted to the hospital, testified that defendant appeared very confused, disoriented to time and place, and out of touch with reality. Defendant continually tried to leave, repeating that she had to pick up her son at a ball game and get home because the other children were home alone.

Defendant testified that her memory of the evening of July 21, 1983, was fragmented. She recalled that Connie Siebeck had asked her to go to a party at the Saloon Tavern, but she did not remember where she sat at the tavern or whether she moved about after arriving. Defendant remembered looking into the mirror behind the bar and seeing York laughing at her. Defendant also recalled wanting to go home. Her last memory at the tavern was of seeing York's face in the mirror with the faces of her two dead husbands circling it and all of them laughing at her. Defendant could next remember "door locks going down" in a car, someone taking a picture, and someone changing her clothes. Defendant did not recall being at the hospital. Her

next clear memory was of leaving for Michigan about a week after the incident to visit her mother. Defendant stated that from the end of August until just before Christmas 1983, she stayed at an alcohol and drug rehabilitation center in Charleston, Illinois. While at the center, she saw Dr. Jerry Boyd, a psychologist. Defendant attended Alcoholics Anonymous meetings approximately three times a week for 3½ years. Defendant further stated that she saw a counselor at the Southeastern Mental Health Clinic for over a year and was treated for extreme anxiety and depression by Dr. Harrison at the Weber Clinic in Olney.

Dr. Michael Phillippe, the emergency room physician who treated defendant, testified that when he first saw her, she was "combative and distraught." Defendant's thought process was disorganized, and she did not know the time or where she was. For an hour and 15 minutes, Dr. Phillippe tried to get defendant's medical history, but she continually talked about being at a baseball game. The only person she recognized was Officer Millsap. Dr. Phillippe did not recall that defendant had given Millsap her sister's telephone number and asked him to call, that defendant had said she had to check on her boyfriend, or that she had recognized her sister and hugged her. Dr. Phillippe's medical opinion was that defendant was in "an acute psychotic state," wherein she was completely separated from reality. Dr. Phillippe opined that defendant was an acute psychotic two to three hours before he examined her at 12:10 a.m., and he believed that defendant "could not purposely intend to do anything." A nurse administered Thorazine, an antipsychotic drug, and Valium at Dr. Phillippe's direction. Dr. Phillippe did not think defendant was sane at the time of the offense, according to the statutory definition of sanity read to him at trial. Dr. Phillippe admitted on cross-examination that defendant's appearance at the jail five to seven minutes after the shooting showed that she was able at that time to appreciate the criminality of her act.

Dr. Dean Pelley, defendant's doctor since 1973, testified that he saw defendant at the hospital at around 8 a.m. on July 22, 1983. Defendant's vital signs were normal. Dr. Pelley stated that defendant was coherent and he believed she was oriented to time, place, and person. Dr. Pelley stated that defendant was not suicidal, but was worried that her ex-husband would want custody of her children. The doctor discharged defendant that morning.

Dr. Eugene L. Ringuette, a clinical psychologist, examined defendant on July 24, 1983. Dr. Ringuette obtained a history from defendant and interviewed both her mother and sister. The doctor administered several assessment techniques, including the Rorschach

Technique, which combines subjective and objective analysis. Defendant's responses indicated a seriously disturbed person who was then exerting great effort to maintain control of her thoughts and feelings. Dr. Ringuette also administered the Minnesota Multiphasic Personality Inventory (MMPI), a test to assess mental disorders. Defendant's test results showed "significant elevations" in the areas measuring depressive feelings, thoughts and behaviors, negative feelings of self-worth, paranoid ideas, and a confusion about events and general anxiety about life.

Based upon his testing and interpretations, Dr. Ringuette determined that defendant "was at best borderline psychotic." The doctor described defendant as a person with a long-term disorder showing "periodic psychotic episodes during the course of a lifetime." Such a person maintains a satisfactory or marginal adjustment to the world and other people most of his or her life, but for certain periods the person will show significant loss of contact with reality and behave dramatically. Dr. Ringuette stated that these periods could last a matter of days or weeks and termed defendant's disorder "chronic schizophrenic dillusional [sic] paranoid."

Dr. Ringuette further testified that his diagnosis, based on the tests he performed, was "brief reactive psychosis," meaning that a mental disorder is present, it is psychotic in severity, and it appears to be of less than two weeks' duration. Dr. Ringuette estimated that the condition began one or two days prior to the shooting. The doctor believed defendant could be capable of acting rationally for periods of time on the night of the shooting, stating that a person can be oriented to time, place, and person and still be grossly psychotic. Dr. Ringuette opined that defendant's condition existed prior to the shooting and that defendant was incapable of forming a criminal "intent" as defined by defense counsel. Dr. Ringuette therefore believed that under the statutory definition of insanity given at trial, defendant was not sane at the time of the occurrence. The doctor stated that the fact Julia had gone to the jail after the shooting was not inconsistent with his diagnosis, but admitted that such behavior showed defendant appreciated the criminality of her act at the time she "turned herself in."

Defendant argues that the evidence relied upon by the State failed to establish her sanity at the time of the crime beyond a reasonable doubt. Defendant contends that none of the occurrence witnesses gave an opinion as to her mental state and that those who saw her immediately after the shooting, with the exception of Officer Millsap, recalled defendant being incoherent. Defendant argues that the jury's

finding as to defendant's sanity is against the manifest weight of the evidence where Dr. Phillippe saw defendant approximately one hour after the shooting and believed that she could not have formed an intent and was insane at the time of the incident and Dr. Ringuette examined her two days later and was of the same opinion.

■ However, after considering the record, we conclude that the evidence presented at trial supports the jury's finding that the State satisfied its burden of proving that defendant was sane at the time of the offense. In meeting its burden of proving defendant sane beyond a reasonable doubt, the State is not required to produce expert testimony (*People v. Skorka* (1986), 147 Ill. App. 3d 976, 981, 498 N.E.2d 607, 611), but may rely on facts in evidence and the inferences which the trier of fact may draw therefrom. (*People v. Marshall* (1983), 114 Ill. App. 3d 217, 226, 448 N.E.2d 969, 975.) Further, the trier of fact may reject expert testimony that a defendant was insane at the time of the offense and conclude that the defendant was sane based solely on lay testimony. *Skorka*, 147 Ill. App. 3d at 981, 498 N.E.2d at 611; *People v. Moore* (1987), 159 Ill. App. 3d 850, 857, 513 N.E.2d 24, 28.

Here, although Drs. Phillippe and Ringuette opined that defendant was insane at the time of the offense, they also testified that defendant appreciated the criminality of her act when, immediately after the shooting, she walked to the county jail. Additionally, there was occurrence witness testimony that defendant was laughing and appeared to be in good spirits at the tavern and that when defendant asked Barbara Pethel if York had left with a woman, she sounded normal but was angry. Officer Millsap testified that shortly after the shooting, defendant was able to recognize him, was able to answer his questions, knew what time it was, and worried that her ex-husband would get custody of her daughters. Millsap also testified that defendant asked to see how her boyfriend was doing and requested that Millsap call her sister, giving him her telephone number. Further, both York and Joyce Guyer testified that previous to the night of the shooting, defendant had threatened to shoot them if she ever saw them together. Hence, there was sufficient evidence of defendant's sanity to allow the jury to reject defendant's insanity defense and find her guilty but mentally ill. (See Ill. Rev. Stat. 1981, ch. 38, pars. 6—2(c), (d).) The State therefore sustained its burden of proving defendant's sanity.

Defendant next contends that the trial court erred in denying her motion for mistrial following testimony by Dr. Pelley which violated the court's *in limine* order. During the trial, defendant filed a motion to bar the testimony of Dr. Pelley, a treating physician, because the

State had conducted an *ex parte* interview without the consent of defendant or her counsel. (See Ill. Rev. Stat. 1989, ch. 110, par. 8—802; *Mondelli v. Checker Taxi Co.* (1990), 197 Ill. App. 3d 258, 265-66, 554 N.E.2d 266, 270.) The trial court ruled that Dr. Pelley's testimony would be limited to what had been disclosed by defense counsel in the doctor's written report.

Dr. Pelley testified for the State in rebuttal. The doctor stated that he saw defendant at the hospital on the morning after the shooting. Dr. Pelley characterized defendant as "depressed and quiet," but found her coherent and not suicidal. The doctor further testified that defendant was concerned about her ex-husband getting custody of their children. In Dr. Pelley's opinion, defendant was oriented to time, place, and person.

Defense counsel raised no objections during Dr. Pelley's testimony. Counsel declined to cross-examine Dr. Pelley and immediately requested that the court hear a motion out of the jury's presence. Defense counsel then requested a mistrial because Dr. Pelley had testified beyond the scope of his report regarding defendant's orientation as to time, place, and person; her nonsuicidal temperament; and her concern about her ex-husband getting custody. The trial court denied defendant's motion, stating:

> "If the defense counsel chooses to gamble by not objecting, they take the risk of waiving their point. Failure to raise it at any time or in any fashion, not having been provided with a copy of the report to follow his testimony with, I assumed that counsel knew what the scope of it was, and there being no objection, I assumed that that was within the scope of the report, or that defense counsel had chosen to allow him to vary somewhat from the Court's directive."

Defendant argues that the trial court abused its discretion by concluding that counsel had waived the issue by failing to object during Dr. Pelley's testimony, without considering whether a mistrial was warranted. The trial court has broad discretion to determine the propriety of declaring a mistrial (*People v. Hall* (1986), 114 Ill. 2d 376, 405, 499 N.E.2d 1335, 1346, *cert. denied* (1987), 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618), and this option should be exercised only when, in the court's opinion, there is a manifest necessity for it or where the ends of justice would be defeated by continuing the trial. *People v. Roberts* (1980), 83 Ill. App. 3d 311, 316, 404 N.E.2d 278, 283.

"Failure to make proper and timely objection to the admission of evidence claimed to be incompetent or otherwise objectionable or to

move to strike it out after its admission \*\*\* generally constitutes a waiver of the right to object and cures the error, if any." (*People v. Trefonas* (1956), 9 Ill. 2d 92, 98, 136 N.E.2d 817, 820.) Defendant contends that her prior motion to bar the testimony of Dr. Pelley was sufficient to constitute a timely objection and that defense counsel's failure to object during the testimony was a matter of strategy so that the improper evidence would not be emphasized before the jury. However, by failing to raise a contemporaneous objection, defendant deprived the trial court of the opportunity to give the jury a timely instruction or admonishment regarding the improper testimony. Instead, defense counsel waited until the testimony was completed to request a mistrial, and did not request that the testimony be stricken until after the jury instruction conference when the jury had been in recess for some time.

In *People v. Rivera* (1989), 182 Ill. App. 3d 33, 537 N.E.2d 924, the defendant similarly contended that his motion for mistrial was improperly denied after a witness testified in violation of the trial court's prior ruling on his motion *in limine*. In *Rivera*, the objectionable testimony occurred during defense counsel's cross-examination of the witness. Defense counsel did not object but decided against further inquiry into the matter. It was not until after two additional witnesses had testified that the defendant made a motion for mistrial. In reviewing this issue on appeal, the *Rivera* court stated:

"It is the general rule that objections must be timely; otherwise, any error is waived. [Citation.] There seems no reason why the same rule should not apply to motions for a mistrial. The court could have corrected any error by instructing the jury to disregard the answer. No request for such an instruction was made. Any possible error, therefore, was waived." (182 Ill. App. 3d at 38, 537 N.E.2d at 928.)

We also see no reason why the waiver rule should not apply here. See *Perez v. Hartmann* (1989), 187 Ill. App. 3d 1098, 1104-05, 543 N.E.2d 1023, 1027.

In order to establish the necessity for a mistrial, it must appear that the jury has been so influenced and prejudiced that it would not, or could not, be fair and impartial and the damaging effect of the evidence cannot be remedied by admonitions or instructions. (*People v. Winfield* (1983), 113 Ill. App. 3d 818, 839, 447 N.E.2d 1029, 1046.) Here, defendant does not argue that the damage could not have been remedied by an instruction to disregard it; nor do we believe this to be the case. Dr. Pelley did not give an opinion as to defendant's sanity at the time of the shooting, and the jury knew that his examina-

tion of defendant was made the following day and that defendant had received antipsychotic drugs during the interim. Thus, waiver aside, we do not believe defendant has shown the necessity for a mistrial, and the trial court's refusal to grant a mistrial was therefore not an abuse of discretion.

Defendant's third contention of error concerns the trial court's giving of the second paragraph of the instruction defining insanity. Defense counsel tendered Illinois Pattern Jury Instructions, Criminal, No. 24—25.01 (2d ed. Supp. 1989) (hereinafter IPI Criminal 2d No. 24—25.01 (Supp. 1989)), which reads, in its entirety, as follows:

> "A person is insane and not criminally responsible for his conduct if at the time of the conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
>
> Abnormality manifested only by repeated criminal, or otherwise anti-social [sic] conduct, [sic] is not mental disease or mental defect."

At the conference on jury instructions, the State argued that the second paragraph should be included and defendant objected, arguing, as she does on appeal, that there was insufficient evidence of repeated criminal or otherwise antisocial conduct to warrant inclusion of the second paragraph. In rejecting defendant's contentions, the trial court stated:

> "There is certainly evidence *** of conduct which could be characterized as technically criminal, whether or not there were charges filed. I don't see any room to argue that anti-social [sic], as meant by the instruction, means reclusive or peculiar or even eccentric. I think they're talking about anti-social [sic] in the sense of being against society, rather than really not participating in the same manner as anybody else.
>
> So, I do not look at [defendant's] drinking habits, for example, as being anti-social [sic], but we have the various altercations with other people, the threats which are alleged to have been made, *** the apparently daily carrying of a weapon, which the last time I looked was illegal.
>
> This instruction does not tell the jury that they can't find her insane. It just says that if they're going to find her insane, they have to find something other than these acts, and we certainly have plenty of evidence *** of other things to support the insanity verdict."

The committee notes for this instruction indicate that the second paragraph is to be given "only when the evidence shows repeated criminal or other anti-social [sic] conduct." (IPI Criminal 2d No. 24–25.01, Committee Notes, at 288 (Supp. 1989).) As the parties observe, there is little case law concerning this point. In *People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972, the Illinois Supreme Court held that the trial court erred in giving the second paragraph of this instruction where there was absolutely no evidence of criminal or antisocial conduct. Instead, the court found that where the defendant had a long history of academic and professional achievement and no record of illegal or antisocial conduct, "the explicit prerequisite for the instruction was absent." (124 Ill. 2d at 192, 529 N.E.2d at 978.) In *People v. Foster* (1976), 43 Ill. App. 3d 490, 356 N.E.2d 1288, this court affirmed the giving of the second paragraph where the evidence showed that the defendant had been arrested numerous times for intoxication, assaulted his wife, and attempted to jump out of a moving automobile.

■ Although the facts of the instant case fall somewhere between *Fierer* and *Foster*, we believe the record shows sufficient evidence of repeated criminal or antisocial conduct to warrant giving the entire instruction. As the trial court noted in making its ruling, the jury had heard testimony concerning: defendant's prior arrest for the battery of Joyce Guyer, a January 1982 altercation between defendant and another woman resulting in defendant's broken leg, defendant's threats to shoot Guyer and York, and defendant's own admission that she always carried a gun in her purse. Given this evidence, we cannot say that the trial court erred in giving the second paragraph of the instruction.

Defendant further asserts that she was denied a fair trial due to the improper closing argument of the prosecutor. Specifically, defendant contends that the prosecutor's repeated references to defendant's expert witness, Dr. Ringuette, as a "so-called" expert, his comments that Dr. Ringuette was paid to create a defense, and his misstatement of the evidence denied defendant a fair trial. We disagree.

It is well established that prosecutors are afforded wide latitude in closing argument, and absent clear abuse of discretion, a trial court's determination as to the propriety of such arguments will not be disturbed on review. Even improper remarks will not result in a reversal of a defendant's conviction unless they represent a material factor in that conviction. *People v. Sheppard* (1990), 193 Ill. App. 3d 401, 403, 549 N.E.2d 968, 972-73; see also *People v. Thompkins*

(1988), 121 Ill. 2d 401, 445-46, 521 N.E.2d 38, 57, *cert. denied* (1988), 488 U.S. 871, 102 L. Ed. 2d 156, 109 S. Ct. 187.

■ Initially, we note that defendant failed to object either at trial or in a post-trial motion to the improprieties in the prosecutor's closing argument alleged on appeal. Defendant therefore has waived any possible objections. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274; *Collins*, 106 Ill. 2d at 275, 478 N.E.2d at 283.) Defendant acknowledges this fact but argues that, collectively, the prosecutor's comments constituted plain error. See 134 Ill. 2d R. 615(a).

In *People v. Walton* (1990), 199 Ill. App. 3d 341, 345-46, 556 N.E.2d 892, 895, the court stated:

"Once again, this court is presented with a claim by defendant's counsel on appeal that the prosecutor's closing argument was egregiously improper, yet defendant's counsel at trial (whom the record shows presented a strong defense by vigorously cross-examining the State's witnesses, calling witnesses for the defense, and filing several pre-trial motions seeking to restrict the presentation of incriminating evidence) *made not one objection* to any of that allegedly improper argument. We are of the opinion that the constraints of the plain error rule should be strictly applied under such circumstances. To hold otherwise would be to place a tactical benefit on defense counsel's silence during an allegedly improper closing argument because counsel would know that the courts of review would consider the issue despite no objections being made. In our view, improper closing arguments (if objected to) are among the easiest of errors for the trial courts to correct." (Emphasis in original.)

Therefore, under a strict application of the plain error doctrine, defendant's conviction may be reversed only upon a showing that the alleged errors affect substantial rights or were sufficiently prejudicial to deny the defendant a fair trial. *People v. Nevitt* (1990), 135 Ill. 2d 423, 448, 553 N.E.2d 368, 378.

Defendant first complains that the prosecution denied defendant a fair trial by making "prejudicial remarks regarding a key defense witness and the defense presented." Defendant argues that since her witness, Dr. Ringuette, had been certified as an expert, it was error to refer to him as a "so-called" expert. However, viewing the prosecutor's closing argument as a whole, it appears that the prosecutor used the witness' professional title, Dr. Ringuette, many more times than

he referred to the witness as a "so-called" expert. Further, as the State suggests, while Dr. Ringuette had been certified as an expert, such a designation does not mean that the jury must accept his expert opinion. It is proper in closing argument to comment on the credibility of a witness. (*People v. Richardson* (1988), 123 Ill. 2d 322, 356, 528 N.E.2d 612, 625, *cert. denied* (1989), 489 U.S. 1100, 103 L. Ed. 2d 943, 109 S. Ct. 1577.) Here, therefore, it was not improper for the prosecutor to attempt to cast doubt on Dr. Ringuette's expert opinion.

However, we agree with defendant that the prosecutor's comments that Dr. Ringuette was paid to "create" an insanity defense and that his opinion regarding defendant's sanity was a "smoke screen" exceeded the bounds of fair argument. Nevertheless, while remarks of this nature have been held to be improper (*People v. Wilson* (1983), 120 Ill. App. 3d 950, 458 N.E.2d 1081; *People v. Starks* (1983), 116 Ill. App. 3d 384, 451 N.E.2d 1298), and are not to be condoned, they are generally considered nonprejudicial. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 548, 464 N.E.2d 659, 684; see also *People v. Robinson* (1980), 91 Ill. App. 3d 1138, 1145-46, 415 N.E.2d 585, 591.) It is our view that the remarks made in the instant case were not plain error where they were not so inflammatory that the jury could not render a fair and impartial verdict.

■ Defendant argues that the prosecutor further erred in misstating the testimony of Drs. Ringuette and Phillippe. Defendant asserts the prosecutor incorrectly argued that Dr. Ringuette had agreed defendant could conform her conduct to the requirements of the law because she shot at a single target, York, rather than firing indiscriminately into the crowd. While Dr. Ringuette did testify that defendant's act of turning herself in showed that she appreciated the criminality of her actions at the time, he did not so testify with regard to the single target theory. However, considering the prosecutor's closing argument as a whole, we do not believe defendant was substantially prejudiced by this misstatement.

The prosecutor's comments regarding Dr. Ringuette's and Dr. Phillippe's testimony were part of the State's argument that defendant's sanity could not drastically change in the five to seven minutes it took her to walk from the scene of the crime to the jail. The fact that both Dr. Ringuette and Dr. Phillippe had agreed that defendant could appreciate the criminality of her conduct at the time she reached the jail supported this theory. Thus, the prosecutor's characterization of Dr. Phillippe's agreement as a retraction of his earlier opinion that defendant was insane is a fair inference to be drawn from the evidence. (See *People v. Reyes* (1981), 102 Ill. App. 3d 820,

833, 429 N.E.2d 1277, 1288.) Moreover, because the trial court instructed the jury that closing arguments are not evidence, any error resulting from the prosecutor's remarks was cured by the court's instruction. See *People v. Howard* (1991), 209 Ill. App. 3d 159, 182, 568 N.E.2d 56, 70.

Although none of the complained-of statements, singly or collectively, constitute plain error, defendant alternatively argues that the failure of defense counsel to preserve the errors denied her the effective assistance of counsel. However, assuming *arguendo* that all of the prosecutor's comments were improper, defense counsel's failure to object to them was not so serious as to deprive defendant of a fair trial, a trial whose result is reliable. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; see also *Sheppard*, 193 Ill. App. 3d at 404, 549 N.E.2d at 973 (defense counsel's failure to preserve issue of prosecutor's improper closing argument, when considered in the context of counsel's overall performance, did not prejudice defendant or affect the outcome of his trial).) The prosecutor's comments here were simply not reversible error.

Finally, defendant contends that her convictions for aggravated battery must be vacated as these charges were used as the predicate offense for the charge of armed violence. In support thereof, defendant cites *People v. Donaldson* (1982), 91 Ill. 2d 164, 435 N.E.2d 477, which held that multiple convictions for both armed violence and the underlying felony of aggravated battery could not stand where a single physical act was the basis for both charges. The State agrees that *Donaldson* is dispositive and urges that we vacate the convictions. Therefore, we direct that defendant's two convictions for aggravated battery be vacated. The trial court entered judgment on both the aggravated battery and armed violence verdict, but imposed sentence on the latter charge only. Since defendant raises no question with regard to the propriety of that sentence, a remandment for resentencing is unnecessary.

For the foregoing reasons, defendant's armed violence conviction is affirmed, but her aggravated battery convictions are vacated.

Affirmed in part; vacated in part.

WELCH and HOWERTON, JJ., concur.