THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY LEE CHAMBERS, Defendant-Appellant.
Fourth District    No. 4—93—0094

Opinion filed April 21, 1994.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Following a jury trial in McLean County, defendant Gregory Lee Chambers was convicted of the murder of Carlette Walton and sentenced to 60 years' imprisonment. He now appeals, contending the following errors:

(1) His fifth amendment right to remain silent was violated because police continued interrogation after he invoked that right, where he had not waived that right. (U.S. Const., amend. V.) His fifth and sixth amendment rights to counsel were violated because he was questioned after invoking his right to counsel either following arrest or 13 days earlier. U.S. Const., amends. V, VI.

(2) His warrantless arrest should have been quashed, his post-arrest statements and evidence taken from his car suppressed because exigent circumstances did not exist, and he had a reasonable expectation of privacy in the home where he was an overnight guest.

(3) The trial court committed reversible error in allowing the State to present other crimes evidence regarding an April domestic incident, since the State put on a minitrial on this evidence and relevance of the testimony was far outweighed by its prejudicial value.

(4) The trial court committed reversible error by allowing witnesses to testify regarding defendant's holster, since that holster was in no way connected to the offense.

(5) The trial court erred in admitting testimony that defendant told a friend six months before decedent's disappearance that he thought about killing decedent, where that testimony was remote, the declarant had a strong motive to lie, the testimony was not a threat, and any relevance was outweighed by its prejudicial impact.

The victim and the defendant, who was married to another, had maintained a relationship. Both were residents of Chicago, and defendant was a Chicago police officer. On April 27, 1991, the victim was beaten during an argument with defendant and, as a result, defendant was suspended pending a police department disciplinary hearing. Defendant's police disciplinary hearing was set for early

December 1991, and the victim was to testify at that hearing. On November 22, 1991, during the evening hours, the victim left with defendant, evidently in his auto. Evidence established that defendant was intent upon convincing the victim to not appear at the disciplinary hearing. The victim disappeared the night of November 22 and her whereabouts were unknown until her body was found on December 14, 1991, near Interstate 74 in McLean County. The body was decomposed, but the cause of death was established as a result of two bullet wounds. One bullet was found and could have been from a 9-millimeter pistol, and defendant had owned such a weapon.

Defendant's statements set forth his parking with the victim near the lake on Lake Shore Drive and later letting her off near 35th Street and Martin Luther King Drive. The only evidence of anyone seeing the victim alive after that was speculative at best. At the time of the April beating, defendant made threats of death if police were notified. There was evidence, by another resident of the jail where defendant was retained, of his incriminating statements.

Evidence presented to the jury was sufficient to establish guilt, and testimony relating to answers given by defendant when interrogated by authorities did not indicate an admission of guilt but, in some respects, placed defendant in a bad light. Additional facts will be related during the discussion of the various issues on appeal.

Defendant was arrested at 9 p.m. on December 14, 1991, and read his *Miranda* rights. He acknowledged each of the warnings and did not request an attorney. Defendant was interrogated four times between midnight on December 14, 1991, and 10:30 a.m. the following day. He was read his *Miranda* rights prior to each interrogation. According to those involved, defendant did not at any time mention that he had retained an attorney nor did he ask to be able to contact one.

Defendant contends he invoked his right to silence soon after the first interview and the right was not scrupulously honored by police. Through subtle compulsion in the form of repeated interrogations and display of inflammatory photographs, defendant claims the police attempted to elicit a confession in violation of defendant's fifth amendment rights.

The first interrogation was conducted by Officers Kelly and Doroba. According to Kelly, he told defendant that Carlette Walton's body had been found and that a third party had made a statement relative to his alleged participation. In Kelly's words, defendant agreed to talk, only "very limited." The interview lasted 10 minutes, whereupon defendant decided he had nothing more to say and the officers ceased all questioning. Both Kelly and Doroba testified that

defendant never asked for an attorney, nor did he ask to use the telephone.

Defendant's mother, Loretta Hill, visited him at the police station at approximately 2:30 a.m. Afterward she went home and, at about 4 a.m., left a message on defendant's attorney's answering machine. The attorney, Steven Greenberg, returned her call between 7 and 8 a.m.

At about 3:30 or 4 a.m., Officers Holmes and Elston initiated the second interrogation. Defendant was read his *Miranda* rights and, after acknowledging that he understood these rights, agreed to talk with the officers. He informed the officers that he would cooperate up to a certain point, but would cease cooperation at the point he was accused of murder. According to Elston, defendant stated midway through the interview that he basically had nothing else to say other than what he had said already. Both Holmes and Elston took this to mean that defendant was not going to change what he had told previous investigators. Elston asked defendant whether they could continue, and defendant replied they could talk to him as long as they wanted. Holmes then showed defendant some photos of the victim as she lay in the morgue, along with other photos of defendant and her together. After 30 to 45 minutes, the officers terminated the interview. Both officers claim defendant never indicated he did not want to talk to any more police officers. Defendant never requested an attorney, nor did he ask to use the phone.

The third interrogation began about 8 a.m. and was conducted by Officer Ridges. Defendant was read his *Miranda* rights, and he replied he was familiar with these warnings because he was a police officer. Ridges testified that defendant was very cooperative and at no time did he indicate that he wished to remain silent or that he wanted an attorney. The interrogation lasted approximately 45 minutes. Defendant indicated a number of areas which were too sensitive to discuss. These included questions of whether he owned a 9-millimeter pistol, whether he had ever been in the Bloomington area, or what occurred after he dropped Walton off after their meeting on November 22, 1991. However, he agreed to speak about anything else.

The fourth interrogation took place at about 10:30 a.m. and was conducted by Ridges and Cook County Assistant State's Attorney Joan O'Brien. Ridges was not present continuously for this interview. Defendant was read his *Miranda* rights, and he agreed to talk with them. Just as in the previous interrogations, when they began to talk about the gun, the Bloomington area, or his whereabouts after his last meeting with the victim, defendant would say that the area was too sensitive and he would not get into that. When he used the word

"sensitive," he did not request the questioning to stop and continued to talk freely about other subjects. Defendant never requested the interview to end. It lasted 45 minutes to one hour and ended on a friendly note.

Defendant's attorney and counsel at trial, Steven Greenberg, testified that he received the message from defendant's mother at approximately 9:15 a.m. and called the police station. He was told he would have to speak with Holmes, who was not available at that moment. He finally got through to Holmes at about 10:30 a.m. and told him he was coming down and that no one should question defendant. He arrived at approximately 11 a.m., spoke with defendant, then left with the instructions that no one was to speak with defendant. These instructions were followed.

According to defendant, at the outset of the first interrogation he told Officers Kelly and Doroba that he chose to exercise his right to remain silent until his attorney arrived. He did not tell them who this attorney was or even whether an attorney had been retained. The interview ended immediately afterward, and defendant was allowed to use the telephone in order to get a message to his attorney. In each subsequent interview, defendant claims he repeated his request to remain silent until his attorney arrived. Nevertheless, officers continued to ask questions. Although defendant admits he engaged in general conversation with his interrogators after exercising his right to remain silent, he claims he did not answer any questions. In denying defendant's motion to suppress, the trial court remarked that it did not find defendant's testimony credible.

In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the Supreme Court held that any statement taken after the person invokes his privilege cannot be other than the product of compulsion. (*Miranda*, 384 U.S. at 473-74, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627-28.) However, the Supreme Court rejected a *per se* proscription on the renewal of questioning following a defendant's initial request to remain silent. The admissibility of a suspect's statements made subsequent to an earlier expressed desire to remain silent depends upon whether his right to cut off questioning was scrupulously honored. *Michigan v. Mosley* (1975), 423 U.S. 96, 103-04, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326.

■ Under the facts in this case, we have no doubt that defendant's right to cut off questioning was scrupulously honored. It is undisputed that the first interview was terminated immediately after defendant expressed a desire to remain silent. All questioning was suspended for over three hours before the second interrogation was initiated. Although defendant indicated during this session that he would not

change anything he had already said, he gave no indication that he wanted questioning to cease. Even so, police were careful to ask defendant whether they could continue talking and, according to the officers, he replied, "Go right ahead." The third interrogation was held after nearly a four-hour break, and there was another break of at least an hour before the third and fourth sessions. In both these interviews, defendant stated he would cooperate up to a certain point, but would not discuss certain sensitive areas. When investigators were told an area was too sensitive, they ceased discussion of the issue and moved on to other areas. At trial, defense counsel objected to testimony regarding defendant's refusal to discuss "sensitive" areas. However, this issue was not raised on appeal.

Two factors are crucial in determining whether a defendant's right to remain silent was scrupulously honored. The first is whether there was a complete cessation of questioning for a significant period of time between defendant's exercise of his right and the reinterrogation. The second factor is whether the subsequent interrogation was preceded by a fresh set of *Miranda* warnings. (*People v. Smith* (1988), 165 Ill. App. 3d 603, 608, 518 N.E.2d 1382, 1385.) Both factors are present in the case at hand. Another factor used to determine whether a defendant's right was scrupulously honored is whether different personnel conduct the second questioning. (*Smith*, 165 Ill. App. 3d at 608, 518 N.E.2d at 1386; *People v. Reyes* (1989), 181 Ill. App. 3d 246, 255, 536 N.E.2d 990, 996.) In this case, different personnel conducted each interview, with the exception of Officer Ridges, who conducted the third interview and was present for a portion of the fourth. We find no violation of defendant's fifth amendment rights.

Next, defendant contends his fifth and sixth amendment rights to counsel were violated when he was questioned after telling police he wished to remain silent until his attorney arrived. He contends this right was invoked on two separate occasions. The first occurred following a police board hearing on December 2, 1991. The right was allegedly invoked again at the outset of the first custodial interrogation following his arrest. Evidence was conflicting as to whether defendant ever asked police for an attorney during questioning after his arrest. The trial judge found defendant's version of events lacked credibility, and we will not disturb this finding on review. Accordingly, we only address defendant's claim that his right to counsel was invoked at the police board hearing two weeks prior to his arrest.

On December 2, 1991, defendant appeared with counsel at a police board hearing concerning defendant's alleged beating of the victim in April 1991. The hearing was not a criminal proceeding. Its

purpose was to determine defendant's employment status with the Chicago police department. After the hearing, three detectives approached defendant and indicated they wanted to speak with him regarding the disappearance of Carlette Walton. According to defendant's attorney, Steven Greenberg, they stepped away from the detectives in order to discuss whether he should speak with them. They agreed it would be best if he did not, and Greenberg walked over to the three officers and conveyed the message. Greenberg then gave the officers a business card and told them they should make contact through his office if they had any further questions for defendant.

Once defendant's sixth amendment right to the assistance of counsel has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective. However, this right to counsel is offense specific and does not attach until a prosecution is commenced. *McNeil v. Wisconsin* (1991), 501 U.S. 171, 175, 115 L. Ed. 2d 158, 166, 111 S. Ct. 2204, 2207.

On appeal, defendant argues that Greenberg's comments to police, although occurring prior to his arrest, were sufficient to invoke his sixth amendment rights. This right to counsel attached, he argues, because of the significant involvement of the prosecutor in the murder case prior to defendant's arrest. This involvement apparently included a grand jury investigation into the victim's disappearance and the issuance of a search warrant for defendant's car.

■ The Supreme Court has ruled that a defendant's right to counsel does not attach until a prosecution is commenced and defines this point as at or after the initiation of adversarial judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. (*McNeil*, 501 U.S. at 175-76, 115 L. Ed. 2d at 166-67, 111 S. Ct. at 2207.) At the time Greenberg spoke with the officers, no formal charge, indictment, or information had been filed in this case. Furthermore, the grand jury proceedings cited by defendant occurred on December 5, 1991, three days after the alleged invocation of the right to counsel. The search warrant was issued only after defendant's arrest.

The extent of a criminal defendant's right to counsel where judicial proceedings have not been initiated was discussed in *United States v. Kenny* (9th Cir. 1981), 645 F.2d 1323. The defendant in *Kenny* was represented by counsel at the time the government recorded his telephone conversations. The government conceded it knew that Kenny had retained counsel. However, Kenny had not been charged, arrested, or indicted at the time the recording was made. Citing *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877,

the court held that the sixth amendment right to counsel does not attach prior to the initiation of adversarial proceedings against an accused. (*Kenny,* 645 F.2d at 1338.) "Where a case is still in the investigative stage, or in the absence of a person's being charged, arrested, or indicted, such adversary proceedings have not yet commenced, and thus no right to counsel has attached." *Kenny,* 645 F.2d at 1338; see also *United States v. Fitterer* (8th Cir. 1983), 710 F.2d 1328.

The *Kenny* decision also observed that the right to counsel sought by Kenny would severely cripple the use of undercover methods to investigate crimes:

> "Those engaged in ongoing criminal activity would be encouraged to obtain 'house counsel,' who would have to be informed prior to government use of informants in the presence of the clients; this would largely destroy the effectiveness of such informants." (*Kenny,* 645 F.2d at 1338.)

As Professor LaFave noted, such a rule would protect the professional criminal most of all and the indigent defendant least of all. 1 W. LaFave & J. Israel, Criminal Procedure § 6.4, at 469 (1984).

In *Moran v. Burbine* (1986), 475 U.S. 412, 429, 89 L. Ed. 2d 410, 426, 106 S. Ct. 1135, 1145, the defendant argued that *Kirby* and other "critical stage" cases concern only the narrow question of when the right to the *appointment* or *presence* of counsel attaches. In contrast, he argued that the right to noninterference with an attorney's dealings with a criminal suspect arises at the moment the relationship is formed. The Supreme Court disagreed, finding defendant's understanding of the sixth amendment both practically and theoretically unsound:

> "As a practical matter, it makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation. [Citation.] More importantly, the suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any 'criminal prosecutio[n],' U.S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the ' "prosecutorial forces of organized society." ' *Maine v. Moulton* [(1985), 474 U.S. 159, 170, 88 L. Ed. 2d 481, 492, 106 S. Ct. 477, 484] (quoting *Kirby v. Illinois,* [406 U.S. at 689, 32 L. Ed. 2d at 418, 92 S. Ct. at 1882]).

By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the 'intricacies...of law,' *ibid.*, is needed to assure that the prosecution's case encounters 'the crucible of meaningful adversarial testing.' *United States v. Cronic*, 466 U.S. 648, 656[, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045] (1984)." (*Moran*, 475 U.S. at 430, 89 L. Ed. 2d at 427, 106 S. Ct. at 1145-46.)

Under the facts in this case, we find no violation of defendant's sixth amendment rights.

■ Next, defendant contends the trial court erred in denying his motion to quash arrest and suppress his post-arrest statements. He was arrested without warrant while staying overnight at a friend's apartment. Defendant cites *Minnesota v. Olson* (1990), 495 U.S. 91, 109 L. Ed. 2d 85, 110 S. Ct. 1684, for the principle that an overnight guest in another's home has a reasonable expectation of privacy and cannot be arrested without a warrant. However, *Olson* involved a nonconsensual entry into a house where the defendant was an overnight guest. In the case at hand, defense counsel admitted at the suppression hearing that there was no dispute that consent was given to police to enter the apartment where defendant was arrested. Our supreme court held that voluntary consent to entry will justify a warrantless at-home arrest, and such consent need not be given by the defendant; it may instead be obtained from a third party. (*People v. White* (1987), 117 Ill. 2d 194, 220-21, 512 N.E.2d 677, 687.) Consent may be obtained from the third party, if he or she possessed common authority over, or sufficient relationship to, the premises. (*People v. Ollins* (1992), 231 Ill. App. 3d 243, 254, 606 N.E.2d 192, 201.) In this case, consent was given by the wife of defendant's friend residing in the apartment. We find no error in the trial court's ruling.

Defendant contends the trial court erred in admitting into evidence defendant's April 1991 battery of the deceased. Evidence of other offenses is admissible if it is relevant for any purpose other than to show propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, 823-24.) Defendant argues that the trial court conducted a minitrial about the incident in order to provide a motive for the murder. As an example, defendant points to the testimony of three of decedent's relatives, only two of whom actually witnessed the incident. Chinyre Scales, decedent's niece, testified that she heard her scream and saw defendant get into his car. She later saw the victim's face covered in blood. Decedent's sister, Evelyn Scales, corroborated her daughter's testimony, but again was unable to say how the victim had been injured. She never saw defendant.

The most detailed testimony came from the victim's mother, who heard defendant threaten the victim's life and was told by defendant not to call the police. She saw defendant take a gun from his side and go into the living room, where she then heard her daughter pleading with defendant not to kill her. She saw defendant strike the victim several times. After calling the police, she then ordered defendant to leave her house. In addition to this testimony, the State presented evidence of statements taken by the officer investigating the beating, plus statements from three friends of defendant who had spoken to him about the incident. Finally, the State offered testimony of Officer Ridges and Assistant State's Attorney O'Brien, who related statements defendant made during his interrogation.

■ Evidence establishing defendant's motive and intent was the central focus of the State's case against him. Defendant's statements to his friends and to the officers who interviewed him after his arrest are clearly probative. Testimony of the victim's mother, who actually witnessed portions of the April 27, 1991, beating incident and was responsible for contacting police on that date, was also clearly admissible. In contrast, testimony of the victim's niece and sister added nothing to the detailed description of events offered by the victim's mother.

For the sake of economy of judicial time, our supreme court has advised against offering detailed evidence of other offenses. (*McKibbins*, 96 Ill. 2d at 186-87, 449 N.E.2d at 826.) While criticizing the use of "mini-trials," the court in that case did not find that the error was prejudicial. The admissibility of evidence at trial is a matter within the sound discretion of the trial court and will not be overturned on appeal, absent a clear abuse of discretion. (*People v. Illgen* (1991), 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519.) Although testimony of the victim's niece and sister served no discernible purpose, we do not find that it constituted reversible error.

■ Next, defendant contends the trial court erred in admitting into evidence testimony regarding defendant's holster, since the holster was not connected to the offense, the evidence lacked credibility, and its prejudicial effect outweighed its probative value. Briefly summarizing the evidence, defendant owned a 9-millimeter Smith & Wesson pistol and was seen in possession of this weapon on the day the decedent disappeared. The decedent was shot with a 9-millimeter weapon, and a 9-millimeter bullet was found lodged in defendant's car. A bullet found in the victim's body was fired from the same gun as the bullet found lodged in the car. Defendant's ex-brother-in-law testified that several days after the victim's disappearance, defendant brought him an empty holster. Testimony was heard

that this holster was designed to carry a 9-millimeter semiautomatic pistol. The murder weapon was never recovered. We find no abuse of the trial court's discretion in admitting evidence regarding the holster. The evidence shows defendant owned a 9-millimeter weapon like the one used in the murder. Defendant's objection to the credibility of this evidence goes to its weight, not its admissibility.

Finally, defendant contends the trial court erred in admitting testimony that defendant told a friend a few months before the decedent's disappearance that he had thought about killing her. John Alexander, defendant's partner on the Chicago police force between 1988 and 1990, testified that in August or September 1991 defendant told him that while he and decedent were at the Sybaris Hotel he put his hands around her neck and thought about killing her. He told Alexander how easy it would be to remove the body from the hotel because of its design, but said he would not know what to do with the body afterward. Assistant State's Attorney O'Brien testified that when confronted with Alexander's claim, he replied that he might have told this to him but, if he did, then he was drunk at the time.

■ Defendant contends Alexander's story is unbelievable, irrelevant, and remote in time. Alexander's credibility was also attacked. These arguments go to the weight of the evidence, not its admissibility. Threats made by an accused against the deceased prior to the commission of the criminal act are admissible in evidence to show malice and criminal intent. (*People v. Johnson* (1979), 70 Ill. App. 3d 149, 154, 388 N.E.2d 225, 228.) Considerations such as the circumstances under which the alleged threats were made, their repetition, and the lapse of time between them and the offense affect only the probative force or weight of such evidence, but not its admissibility. (*People v. James* (1990), 200 Ill. App. 3d 380, 390, 558 N.E.2d 732, 739.) The probative value of this testimony is not diminished by the fact that the threat was not made directly to the victim. We find no error in the trial court's admission of this evidence.

Affirmed.

KNECHT and COOK, JJ., concur.