THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTONIO SEGOVIANO, Defendant-Appellant.

First District (1st Division)   No. 1—95—4286

Opinion filed June 29, 1998.—Rehearing denied August 4, 1998.

Rita A. Fry, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Alan J. Spellberg, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:
Defendant Antonio Segoviano appeals from his convictions for attempted robbery and murder after a jury trial in which an imposter testified as an occurrence witness and the real occurrence witness gave exculpatory testimony.

We address the following issues on appeal: (1) whether defendant's due process rights were violated by the introduction of false testimony from an imposter witness; and (2) whether the trial court properly denied defendant's motion to quash arrest and suppress evidence. We hold that the introduction of false testimony by the imposter witness during trial violated defendant's due process rights. For the reasons that follow, we reverse and remand for a new trial.

## I. FACTS

On November 9, 1993, at approximately 4:30 p.m., defendant, Arnel Robinson, Mario Rodriguez and Jerome J. Lewis were at the projects near 31st and Halsted Streets in Chicago. They talked about purchasing narcotics. These individuals walked down 31st Street to a pay phone where Jerome J. Lewis, also known as "J.J.," called his girlfriend for a ride. Mario Rodriguez was with Jerome J. Lewis at the pay phone. While Lewis was on the phone, defendant, also known as "Little Cap" or "Little Capone," and Arnel Robinson were standing a few feet away. Arnel Robinson showed defendant the black .357 gun he carried in his pants and the two agreed that they would locate a suitable victim to rob.

A currency exchange was located nearby. There was an alley next to the currency exchange which veered off into another alley and then led out to the main street. Defendant and Arnel Robinson agreed that defendant would go into the currency exchange and locate an individual to rob while Robinson waited in the mouth of the alley.

At this time, Onesimo Beltran and Martin Alvarez pulled into the alley in their truck. Mr. Alvarez had to stop at the currency exchange to pick up a city sticker he had ordered the previous week. Mr. Alvarez went into the currency exchange while Mr. Beltran waited in the truck and began scraping off the old city sticker from the windshield.

Defendant followed Mr. Alvarez into the currency exchange. Mr. Alvarez spoke with Steven Schoenberg, the manager, who informed him that his sticker had not yet arrived. While they were conversing,

defendant etched his nickname, "Little Cap," into the wall. Mr. Schoenberg told defendant to stop.

Defendant followed Mr. Alvarez out of the currency exchange and into the alley. At the mouth of the alley, Arnel Robinson grabbed Mr. Alvarez. Defendant continued walking beyond the bend in the alley to where Mr. Beltran was scraping the city sticker off his truck's window. Defendant demanded money. Mr. Beltran replied that he did not have any money and closed the door of the truck. Defendant began walking back down the alley toward the currency exchange.

Two shots were fired. Mr. Beltran looked in the mirror of his truck and saw people grabbing at Mr. Alvarez. Mr. Beltran called to Mr. Alvarez. Mr. Alvarez, bleeding, got in the truck and the two drove to their home, where they called an ambulance. Mr. Alvarez died from a gunshot wound to his chest.

At trial, one of the witnesses the People called to testify on the first day of trial stated that his name was "Jerome Lewis." "Jerome Lewis" testified that he preferred to be called "Stacy." He stated that he was currently serving time in jail in Minnesota.

"Jerome Lewis" testified that shortly after 4 o'clock on November 9, 1993, he was near a pay phone at 31st Street between Lituanica and Halsted Streets in Chicago. The witness stated he was going to call his girlfriend on the pay phone to get a ride to pick up some drugs. The witness, "Jerome Lewis," testified that while he was at the pay phone, he heard defendant talking to Arnel Robinson. Specifically, the witness testified that "[defendant] asked Arnel would he help him stick up the Mexican guy" and that Arnel Robinson replied, "Let's do it." The witness stated that defendant was 10 to 12 feet away when he said this and that Mario Rodriguez was also present. The witness then testified that he saw Arnel go into the alley and defendant go into the currency exchange. The witness said defendant came out of the currency exchange after two or three minutes, held his left hand above his head with all five fingers showing and then reentered the currency exchange. The witness stated that the "Mexican guy" exited the currency exchange and walked into the alley with defendant following behind him. The witness stated that Arnel was already in the alley at this time. Next, the witness testified, he began crossing the street when he heard two gunshots coming from the alley. After the gunshots, the witness stated that defendant crossed the street to where defendant's mother was standing and the witness left with his girlfriend, who had come to pick him up.

During cross-examination, this witness first testified that his name is "Stacy Lewis" and that he has an older brother named "Jerome" who also goes by the name "J.J." The witness testified that he had

used his brother's name in connection with prior arrests but that he did not use his brother's name in connection with this case. The witness then stated that his own name is "Jerome" and that his brother's name is "Stacy." The witness admitted that he had used other dates of birth in prior encounters with the law.

The following day, the People called three more witnesses. After all the witnesses testified, the court held a hearing outside the jury's presence to determine whether the person who testified earlier was actually Jerome Lewis or was Jerome Lewis's brother. At this hearing, defense counsel presented the testimony of another individual calling himself "Jerome Lewis." The trial court then declared that an independent investigation would be held to determine whether "your brother or you were the person at that location at 31st by the currency exchange."

The next day, outside the presence of the jury, the prosecutor told the trial court that the witness, "Jerome Lewis," who had previously testified, admitted he was not present at the scene of the shooting. The prosecutor explained the situation to the court as follows:

"He says that in fact he was not present. He said it was his brother who was present; that he testified because he thought his brother might run into some problems if the brother testified for the State. So he came down here to testify figuring he was safe up in Minnesota. He said he learned about the incident from his brother after it happened, and that's why he did that. I asked Mario Rodriguez to look at the individual and he did, and he said that was not the J.J. who was present at the incident."

The prosecutor then suggested that the trial court declare a mistrial, stating that, "I believe the jury has heard this evidence. I don't know if there's any way that can be cured and still allow a fair ruling or fair disposition on the part of the jury." The defense counsel opposed a mistrial, stating, "The State's obligation is simply to correct, to explain to the jury that testimony should be disregarded. *** I believe it would be a jeopardy issue if your honor declared a mistrial." The trial court denied the People's motion for a mistrial, stating that the trial "has not been reduced to a farce and a sham."

The court ordered the prosecutor to formally withdraw the false testimony in the jury's presence with an explanation of what occurred. The prosecutor addressed the court as follows:

"[PROSECUTOR]: Judge, just briefly. As an assistant State's Attorney one of my functions is to prosecute obviously felons. In addition, I also have an obligation to see that justice is done here. So I would like to inform the Court and the jury that the other day we put a witness on who to my belief was a person by the name of Jerome Lewis, a witness to the incident.

Upon further investigation I determined that in fact he was Stacy Lewis the brother of Jerome Lewis and was in fact not a witness to the incident, and as a result of that fact his testimony which he completely fabricated obviously should not have been presented.

I'm asking at this time that the jury disregard that and that his testimony be withdrawn and that he perjured himself while on the stand.

THE COURT: Mr. Lewis' testimony will be stricken, and I'm going to tell you to disregard completely all the testimony that this person from Minnesota penitentiary said and completely disregard that."

The People next called the real Jerome Lewis. He testified that his name is Jerome John Lewis and that he has an older brother named Stacy Lewis or Stacy Cueto. He testified that he was at the pay phone with defendant calling his girlfriend for a ride. He stated that he heard two gunshots coming from the alley, but that the gunshots did not come from defendant. The real Jerome Lewis then testified that he had no recollection whatsoever of being at the police station later that morning and did not recall speaking with the assistant State's Attorney.

The jury returned its guilty verdict on August 24, 1995. Defendant filed his posttrial motion for a new trial on September 26, 1995. He filed an amended motion for a new trial on September 28, 1995. The trial court denied the motion and this appeal followed. Defendant was sentenced to 45 years' imprisonment for murder and 15 years' imprisonment for attempted armed robbery with the sentences to be served concurrently.

## II. ANALYSIS

A. Due Process of Law

Defendant first argues that his convictions for first degree murder and attempted armed robbery should be reversed because the People called an imposter witness at trial. The People's witness, Stacy Cueto, impersonated Cueto's brother, J.J. Lewis. Defendant asserts that the introduction of this false testimony violated defendant's due process rights. Defendant submits that this court should remand the matter for a hearing to determine whether further prosecution should be barred by double jeopardy.

The People maintain that defendant waived this issue by failing to file a timely posttrial motion. Even if defendant did not waive the issue, the People argue, any harm that defendant may have suffered from the improper testimony was cured when the jury was repeatedly instructed that the testimony had been stricken and should not be considered.

■ The first contention we will address is whether defendant waived this issue for review by failing to file a timely posttrial motion. Section 116—1 of the Code of Criminal Procedure provides that a defendant must file a written motion for a new trial within 30 days following the entry of a finding or the return of a verdict. 725 ILCS 5/116—1 (West 1994). In this case, defendant filed his motion for a new trial 32 days after the jury returned its verdict.

■ While ordinarily defendant may be deemed to have waived review of this issue, the waiver rule is not absolute. Plain error may be considered where the record clearly shows that an alleged error affecting substantial rights was committed. 134 Ill. 2d R. 615(a); *People v. Stout*, 110 Ill. App. 3d 830, 835, 443 N.E.2d 19 (1982). The purpose of the plain error rule is to afford certain protections to the accused by correcting serious injustices and to protect and preserve the integrity and reputation of the judicial process. *People v. Young*, 128 Ill. 2d 1, 46, 538 N.E.2d 453 (1989). The rule may be applied in criminal cases where the evidence is closely balanced or the error is of such magnitude that its commission denies the accused a fair and impartial trial. *Young*, 128 Ill. 2d at 47.

While defendant filed his posttrial motion two days beyond the statutory limit, this was not a situation where the defendant failed to raise the issue in his motion. Here, defendant raised the alleged due process violation in his posttrial motion and argued it at the hearing on the motion. The motion fairly notified the State and the trial court of the alleged error and provided the court with an opportunity to remedy the error. Further, the alleged error in this case concerns a due process violation which deprived defendant of his liberty based on testimony from an imposter witness. As such, the alleged error is of such magnitude that its commission denied defendant a fair and impartial trial. Accordingly, we will review the issue as plain error.

■ A mistrial should be granted only when there is a manifest necessity to stop the proceedings or where the ends of justice would be defeated by continuing the trial. *People v. Redd*, 135 Ill. 2d 252, 323, 553 N.E.2d 316 (1990); *People v. Camden*, 219 Ill. App. 3d 124, 135, 578 N.E.2d 1211 (1991). It must appear that the jury has been so influenced and prejudiced that it would not be fair and impartial to continue the trial and that the damaging effect of the evidence cannot be remedied by admonitions or instructions. *Camden*, 219 Ill. App. 3d at 136. The denial of a request for a mistrial will not be disturbed unless the trial court's decision was a clear abuse of discretion. *People v. Hall*, 114 Ill. 2d 376, 405, 499 N.E.2d 1335 (1986).

■ Further, it has long been recognized that a criminal conviction obtained through the knowing use of false testimony is contrary to

fundamental principles of fairness in a civilized society and constitutes a violation of due process. *People v. Jimerson*, 166 Ill. 2d 211, 223, 652 N.E.2d 278 (1995); *People v. Cihlar*, 111 Ill. 2d 212, 216-17, 489 N.E.2d 859 (1986); *People v. Cornille*, 95 Ill. 2d 497, 448 N.E.2d 857 (1983); see also *Napue v. Illinois*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959). Such a conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *United States v. Bagley*, 473 U.S. 678, 678-80, 87 L. Ed. 2d 481, 492, 105 S. Ct. 3375, 3381-82 (1985); *People v. Olinger*, 176 Ill. 2d 326, 345, 680 N.E.2d 321 (1997).

In this case, Stacy Cueto testified at trial as "Jerome Lewis." He stated that he heard defendant ask Arnel Robinson if Arnel would help him "stick up the Mexican guy" and that Arnel Robinson replied, "Let's do it." The witness then testified that he saw Arnel go into the alley and defendant go into the currency exchange. The witness said defendant came out of the currency exchange after two or three minutes, held his left hand above his head with all five fingers showing and then reentered the currency exchange. The witness stated that the "Mexican guy" exited the currency exchange and walked into the alley with defendant following behind him. The witness stated that Arnel was already in the alley at this time. Next, the witness testified, he began crossing the street when he heard two gunshots coming from the alley. The witness stated that defendant crossed the street after the gunshots were fired.

The real Jerome Lewis later testified that defendant was standing with him at the pay phone during the alleged robbery. He stated that he heard two gunshots coming from the alley, but that the gunshots did not come from defendant.

■ We find that the trial court abused its discretion in denying the prosecution's motion for a mistrial. The jury, through Stacy Cueto's false testimony, heard a detailed account of defendant's participation in the armed robbery. This testimony came from a critical witness. Further, this was not a situation where the jury heard harmful testimony but was quickly instructed to disregard. We acknowledge that it took time for the court to conduct a hearing and an investigation to determine the true identity of the witness testifying as "Jerome Lewis." However, as a result, the court did not instruct the jury to disregard the false testimony until two days later.

The impressions formed by this testimony sat uncorrected in the jurors' minds for two days. Even in light of the other evidence of defendant's guilt, there was a reasonable likelihood that the imposter's testimony inculpating the defendant affected the jury's verdict and deprived defendant of a fair trial. As our supreme court stated in *Cor-*

*nille*, "It is antithetical to our system of justice to refuse to grant a new trial for a defendant when it is convincingly established that he was convicted on the basis of false testimony." *Cornille*, 95 Ill. 2d at 507.

Moreover, the damaging effect of Stacy Cueto's false testimony could not have been cured by jury instruction. While the trial court ordered that the testimony be stricken and instructed the jury to disregard, this did not eliminate the possibility of prejudice. We acknowledge the principle that faith in the ability of a properly instructed jury to separate issues and reach a correct result is the cornerstone of the jury system. *People v. Illgen*, 145 Ill. 2d 353, 376, 583 N.E.2d 515 (1991); *People v. Mikell*, 217 Ill. App. 3d 814, 830, 577 N.E.2d 1300 (1991). Normally it would be presumed that the jury followed these instructions and completely disregarded the impostor's testimony; however, based on the totality of the circumstances we find that Stacy Cueto's false testimony tainted the fundamental fairness of the trial, such that the continuation of the proceeding defeated the ends of justice and denied the defendant due process. Defendant did not receive a trial resulting in a "verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 131 L. Ed. 2d 490, 506, 115 S. Ct. 1555, 1566 (1995).

Errors, even of a constitutional nature, may be regarded as harmless; however, the prosecution has the burden to show beyond a reasonable doubt that the violation did not contribute to defendant's conviction. *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 828 (1967). If spite of the other evidence in the record, we are unable to say, beyond a reasonable doubt as required by *Chapman*, that the testimony of the imposter witness did not contribute to the defendant's conviction. Accordingly, we reverse defendant's conviction and remand the matter for a new trial.

■ Defendant argues that further prosecution should be barred by double jeopardy. The double jeopardy clause " 'bars retrials where "bad-faith conduct by judge or prosecutor" [citation] threatens the "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecutor a more favorable opportunity to convict" the defendant.' [Citation.]" *Lee v. United States*, 432 U.S. 23, 33, 53 L. Ed. 2d 80, 89, 97 S. Ct. 2141, 2147 (1977); see also *People v. Ortiz*, 151 Ill. 2d 1, 600 N.E.2d 1153 (1992).

For purposes of double jeopardy, the United States Supreme Court has distinguished between judgments reversing convictions due to trial error and judgments reversing convictions for evidentiary insufficiency. *People v. Mink*, 141 Ill. 2d 163, 173, 565 N.E.2d 975 (1990). The double jeopardy clause precludes retrial after a court of review has

concluded that the trial evidence was legally insufficient to convict, but does not preclude retrial if an error in the proceedings leading to the conviction caused the reversal. *Mink*, 141 Ill. 2d at 173-74.

■ In the instant case, reversal is based on our determination that the defendant has been convicted by means of a judicial process defective in a fundamental respect. However, the evidence presented at trial was legally sufficient for a jury to decide that defendant was guilty beyond a reasonable doubt. Therefore, the double jeopardy clause does not preclude retrial of a defendant whose conviction as in this case is reversed because of an error in the proceedings leading to the conviction. *Mink*, 141 Ill. 2d at 173-74.

Furthermore, although it was the defense and not the State who discovered Cueto's real identity and who produced the real Jerome Lewis, the State, upon learning of the false testimony, moved that the trial court declare a mistrial. The defense opposed a mistrial and the judge denied the People's motion. Accordingly, we find that the State's request for a mistrial upon discovering the nature of the perjured testimony defeats any notion of prosecutorial misconduct that would require further prosecution be barred by double jeopardy.

B. Motion to Quash Arrest and Suppress Statements

Since we are reversing and remanding for a new trial, we need not resolve the remaining issues on appeal. However, we will address defendant's argument that the trial court erred in denying his motion to quash arrest and suppress evidence.

In this case, we are presented with a situation where a warrantless arrest was executed in a residence where defendant was an invited guest. It is disputed whether the police were given voluntary consent to enter the premises. The trial court's determination concerning such factual matters will not be disturbed unless manifestly erroneous. *People v. Adams*, 131 Ill. 2d 387, 400, 456 N.E.2d 561 (1989).

■ A warrantless arrest in a private residence is proper if the police have probable cause to arrest and an occupant of the dwelling gives the police voluntary consent to enter or exigent circumstances exist which justify the arrest. *Payton v. New York*, 445 U.S. 573, 590, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1382 (1980) (holding that the fourth amendment prohibits a warrantless arrest in a private residence unless it is accompanied by exigent circumstances); *People v. Bean*, 84 Ill. 2d 64, 417 N.E.2d 608 (1981) (holding that fourth amendment rights were not violated, even in the absence of exigent circumstances, where consent given and arrest based on probable cause). This rule necessitates two considerations: (1) whether the police had probable cause to arrest; and (2) whether Martha Jacquez voluntarily

consented to having the police enter her home or whether exigent circumstances existed to justify defendant's arrest.

Probable cause for arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a person of reasonable caution to believe that an offense has been committed and that the person arrested committed the offense. *People v. Henderson*, 266 Ill. App. 3d 882, 640 N.E.2d 1344 (1994).

Mere suspicion is inadequate to establish probable cause to arrest, but evidence relied upon by arresting officers need not be sufficient to prove guilt beyond a reasonable doubt or even be admissible at trial. *People v. Wilson*, 260 Ill. App. 3d 364, 632 N.E.2d 114 (1994). The determination, which considers only information available to officers before the arrest, must focus on the factual considerations upon which reasonable, prudent people, not legal technicians, act. *People v. Adams*, 131 Ill. 2d 387, 398, 546 N.E.2d 561 (1989).

■ We find that the information available to the officers before the arrest indicated that there was a reasonable probability that defendant committed the offense. Officer Thomas Taglioli testified at the hearing on the motion to quash arrest and suppress evidence. He testified that Ms. Nadine Lopez stated she heard two gunshots coming from the area of the currency exchange and saw several males leaving the area. She said that defendant, Arnel Robinson, J.J. and Mario Rodriguez were among the individuals she saw fleeing the scene. The record indicates that Mario Rodriguez also identified defendant as a participant in the shooting of Martin Alvarez. As such, the trial court did not err in finding that probable cause existed for the arrest.

We will next address the question of whether Ms. Jacquez voluntarily consented to the police entering her apartment to arrest defendant.

■ Voluntary consent to entry need not be given by the defendant to justify a warrantless, at-home arrest. Such consent may be obtained from a third party. *People v. Chambers*, 261 Ill. App. 3d 123, 132, 633 N.E.2d 123 (1994). The consent may be in the form of words, gesture or conduct. *People v. Gross*, 166 Ill. App. 3d 413, 423-24, 519 N.E.2d 1043 (1988) (holding that entry was consensual where defendant opened his apartment door for officers then sat down at his kitchen table and officers followed him into apartment). Voluntariness of consent is determined by the totality of the circumstances. *People v. Salgado*, 83 Ill. App. 3d 653, 404 N.E.2d 432 (1980). Whether consent is voluntary is a factual determination and a reviewing court should not substitute its judgment for that of the trier of fact unless the finding is manifestly erroneous. *People v. Ellis*, 187 Ill. App. 3d 295, 543 N.E.2d 196 (1989).

■ In this case, there was conflicting testimony on whether Ms. Jacquez gave the police voluntary consent to enter her apartment. At the hearing on the motion to quash arrest and suppress statements, Ms. Jacquez testified that she went to the park to get defendant because a friend told her he was high on PCP. Ms. Jacquez drove defendant to her home and put him in her bedroom. Ms. Jacquez stated that she heard a knock on the door at around 11:30 p.m. When she answered the door, six or seven police officers "said they wanted Tony." The officers indicated they wanted to speak with defendant about the same shooting they had talked to him about earlier. She stated that the officers did not have a warrant and they "just pushed their way into the house." Specifically, Ms. Jacquez testified as follows:

"Q. Did you at any time consent to allow the officers to enter your home?

A. No, I did not."

She testified that the officers then began searching the rooms, grabbed defendant, handcuffed him and took him to the squad car.

Officer Thomas Taglioli and Officer Michael Jetel's testimony contradicted that of Ms. Jacquez. Officer Taglioli testified that he was at Martha Jacquez's apartment with approximately six other tactical officers. They knocked on the door, but there was no response. He stated that Ms. Jacquez then appeared outside the building with another female. Officer Taglioli testified that Ms. Jacquez denied knowing where defendant was at first, but later told the officers he was in her apartment on the second floor. The officers all entered the building and Ms. Jacquez led them up the staircase in the common area. At the top of the stairs, Officer Jetel asked Ms. Jacquez if he could enter the apartment and she took him in the apartment and the door was closed. The other officers waited in the hallway. Officer Taglioli testified that when the door was next opened, Officer Jetel motioned to the other officers that defendant was in the front bedroom. The officers arrested defendant.

Officer Michael Jetel's testimony mirrored that of Officer Taglioli. He stated that the officers did not threaten or coerce Ms. Jacquez into letting them into her apartment. He also stated that Ms. Jacquez "never told us we couldn't come in." Officer Jetel testified that Ms. Jacquez told them defendant was upstairs in her apartment. He said that Ms. Jacquez opened the door to the apartment building and the officers followed her up the stairs. At her apartment door, she let Officer Jetel in, closed the door and "whispered that Tony's in the front bedroom."

The trial court found from a review of the testimony that the totality of the circumstances indicated that Ms. Jacquez voluntarily

consented to the police entering her apartment. We find no manifest error in the trial court's finding of consensual entry. Further, we note that our conclusion does not change even if we use a *de novo* standard of review. See *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996).

Defendant also contends that the court erred in failing to suppress defendant's statements made at the police station as having been obtained in violation of the fourth amendment prohibition against unreasonable searches and seizures. The People argue that no evidence need be suppressed because probable cause existed for defendant's arrest and the statements defendant sought to suppress were made at the police station and not in Ms. Jacquez's home.

Even if a defendant is arrested in his home without a warrant in violation of *Payton v. New York*, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980), his subsequent incriminating statements made outside his home will not be suppressed if the arrest was made with probable cause. *New York v. Harris*, 495 U.S. 14, 21, 109 L. Ed. 2d 13, 22, 110 S. Ct. 1640, 1645 (1990). In the instant case, the police had probable cause to arrest defendant. Further, defendant's incriminating statements were lawfully obtained at the police station. Accordingly, the trial court did not err in denying the motion to suppress defendant's statements. See *People v. Long*, 208 Ill. App. 3d 627, 635-36, 567 N.E.2d 514 (1990).

In light of all of the foregoing, we affirm the trial court's ruling on defendant's motion to quash arrest and suppress evidence. However, we reverse and remand for a new trial in that the introduction of false testimony through the imposter witness violated defendant's due process rights.

Reversed and remanded.

BUCKLEY, P.J., and GALLAGHER, J., concur.